# Killam *versus* Killam.

*Legitimation by Act of Assembly.—Effect of on Estate of Person
declared Legitimate.—Rights of Parents and Collateral Heirs.*

1. An estate already descended to the legal heir, cannot, by a subsequent
act of legitimation, be divested and given to a bastard: but the legislature can
cure the taint of his blood for the purpose, of future inheritance.

2. In 1853, the legislature enacted "that George W. K., son, and Emily
M., daughter of George K., shall have and enjoy all the rights and privi-
leges, benefits and advantages of children born in lawful wedlock, and shall
be able and capable in law to inherit and transmit any estate whatsoever, as
fully and completely to all intents and purposes, as if they had been born in
lawful wedlock." It was judicially ascertained that George and Emily were
the children of the same father and mother, and that the parents survived
them, Emily dying in 1860, leaving issue, and George in 1859, without issue,
intestate and seised in fee of a tract of land, which was afterwards sold by

[Killam v. Killam.]

the mother. In an ejectment, brought by the father against the purchaser it was held,

First. That by the Act of 1853, George the son was legitimate when he died in 1859, and that he could transmit and Emily could inherit, under the intestate laws, land conveyed to him by his father, in consideration of love and affection, as if no defect had existed:

Second. That at his death, the fee simple descended to the sister, subject to a life estate of his father and mother for their joint lives and the life of the survivor.

ERROR to the Common Pleas of *Wayne county.*

This was an action of ejectment, brought August 22d 1860, by George Killam against Jeptha Killam, for a tract of land in Manchester township, Wayne county, in which a case was stated for the opinion of the court below, embodying the following facts:—

George Killam, the plaintiff, was the father of two illegitimate children born of the body of Elizabeth, afterwards intermarried with Nathaniel Tyler.

These children, who were named Emily and George W., were supported and educated by their putative father exclusively, from their infancy, and were known as George W. and Emily Killam.

Emily was married to Charles W. Miles, by whom she had three children.

On the 15th of April 1853, at the instance of George Killam, the plaintiff in this suit, as of his two illegitimate children, the following Act of Assembly was passed and approved by the governor: " Section 7. That George W. Killam, son, and Emily Miles, daughter, of George Killam, late of Wayne county, shall have and enjoy all the rights and privileges, benefits and advantages of children born in lawful wedlock, and shall be able and capable in law to inherit and transmit any estate whatsoever as fully and completely to all intents and purposes, as if they had been born in lawful wedlock."

On the 27th of December 1853, in consideration of one dollar and natural love and affection, George Killam executed a deed to George W. Killam, among others for a certain piece or parcel of land situate in the township of Manchester, Wayne county, Pennsylvania, and bounded easterly and northerly by the Delaware river, westerly by a lot of land in said township in the warrantee name of James Mease, and which is numbered on the Commissioners' books of said county No. 197 Manchester township, and bounded southerly by a lot in the warrantee name of John McCahan, and which is numbered on the Commissioners' books of said county No. 198 Manchester township, containing two hundred and eighty-eight acres, more or less, reserving a life estate in said land.

In 1855 the following Act of Assembly was passed: " Section

[Killam *v.* Killam.]

3. That illegitimate children shall take and be known by the name of their mother, and they and their mother shall respectively have capacity to take and inherit from each other personal estate as next of kin and real estate as heirs in fee simple, and as respects said real or personal estate so taken and inherited, to transmit the same according to the intestate laws of this state."

On the 2d of August 1858, George Killam, the plaintiff, for the consideration of $400, executed a deed in fee simple to George W. Killam for this property, releasing his life estate therein.

In the summer of 1859, George W. Killam died seised and in possession of said real estate, intestate and without issue. In the spring of 1860 his sister Emily Miles died, leaving a husband and three minor children.

On the 10th of May 1860, Elizabeth Tyler, the mother of George W. Killam and Emily Miles, claiming said real estate as heir of her deceased son George W., joined with her husband, Nathaniel Tyler, in conveying it to Jeptha Killam, who entered into possession with full knowledge of the fact that the land was claimed both by George Killam and by Emily Miles previous to her death, as heirs of George W. Killam.

This ejectment was then brought, and on the foregoing facts it was agreed that if the court were of opinion that, in law, the title or right of possession to said referred-to lot of land became vested in said George Killam as legal heir of the said George W. Killam, deceased, then judgment to be entered by the court in this case in favour of the plaintiff and against the defendant for the land in dispute, with costs of suit; but if the court were of opinion that the title to the said lot of land became vested upon the death of said George W. Killam in said Elizabeth Tyler as legal heir of said George W. Killam, deceased, then judgment to be entered by the court, in this case, in favour of the defendant and against the plaintiff, with costs of suit. Reserving to either party the right to take a writ of error upon the judgment entered hereon.

After hearing the argument of counsel, judgment was entered in favour of the plaintiff for the premises with costs of suit, &c. The defendant thereupon sued out this writ, averring here that the court below erred in entering judgment for plaintiff and in not entering judgment for defendant.

*C. P. & G. G. Waller*, for plaintiff in error.

*W. H. & Samuel E. Dimmick*, for defendant in error.

The opinion of the court was delivered, May 8th 1861, by

[Killam *v.* Killam.]

WOODWARD, J.—The reason why a bastard cannot inherit, by the common law, is because he is the son of nobody. Having no ancestor, his blood possesses no inheritable quality; though, in respect of his own children, it has the usual descendible quality of pure blood. But a bastard may be made legitimate and capable of inheriting, says Blackstone, in 4th Inst. 36, by the transcendent power of an Act of Parliament, and not otherwise, as was done in the case of John Gaunt's bastard children by a statute of Richard II. We have on our statute books acts of legitimation without number. Because our constitution is silent on the subject the legislative power is plenary—I am not aware that it has ever been questioned. An estate that has already descended to the legal heir cannot be divested and given to the bastard by a subsequent act of legitimation, but that the taint of his blood may be cured, for purposes of future inheritance, by the healing touch of the legislature, is not to be doubted. It is not so questionable an exercise of power as the restoration of inheritable blood by the reversal of an attainder for treason, for the corruption there proceeds from disloyalty to the state, which is a much more grievous offence than fornication.

The business now in hand, however, is not to vindicate the legislative power to restore bastards, but to interpret an act of legitimation. In 1853 the legislature enacted, "that George W. Killam, son, and Emily Miles, daughter, of George Killam, of Wayne county, shall have and enjoy all the rights and privileges, benefits and advantages of children born in lawful wedlock, and shall be able and capable in law to inherit and transmit any estate whatsoever, as fully and completely to all intents and purposes, as if they had been born in lawful wedlock."

These are very large enabling words. The very definition of a legitimate person is one born in lawful wedlock, and whatever capacities to inherit or transmit an estate such a person possessed in 1853, or should acquire thereafter, were to belong to George W. Killam, and to be among his "rights, privileges, benefits, and advantages." So much is clear. But lawful wedlock with whom? The mother of George W. and Emily is not mentioned or referred to in the enactment. Whether they were children of the same mother, and who was the mother of either or both, the legislature seems not to have known or inquired. They meant undoubtedly that the children should have the same legal capacities as if their father had been, at the time of their birth, the lawful husband of their mother, and it is fortunate that the construction of the act is rendered easier by the ascertained fact that they had a common mother.

Elizabeth Tyler was the mother of both. They were both born before 1821. After their birth, but long before the Act of 1853, their mother was married to Nathaniel Tyler, and both

[Killam *v.* Killam.]

she and the father, George Killam, survive both children. Emily married, and died in 1860, leaving a husband and three minor children. George W. died intestate, in 1859, unmarried and without issue, seised in fee simple of two hundred and eighty acres of land, the subject of the present controversy. In 1860 Tyler and wife conveyed the land to Jeptha Killam, with full notice that it was claimed both by the father George Killam, and by the sister Emily Miles, then still alive. This ejectment was brought by George Killam, the father of the bastard, against Jeptha, the purchaser from the mother of the bastards, and upon this state of facts the court so construed the Act of 1853, as to give the judgment and the land to the plaintiff.

The necessity of defining the exact effect of the Act of 1853, is shown by our general intestate laws, which provide for the succession to the estates of intestate children, whether they be legitimate or illegitimate. If legitimate, the real estate, by the 3d section of the Act of 8th April 1833, relative to intestates, goes to the father and mother of the intestate child during their joint lives and the life of the survivor; and by the 5th section to them in fee simple, "in default of issue, and brothers and sisters of the whole blood and their descendants." If the decedent be an illegitimate, then by the 3d section of the Act of 27th April 1855, his real estate goes to his mother in fee simple.

Was George W. legitimate, or illegitimate, when he died in 1859? That depends on the effect of the Act of 1853. If legitimate, then his father and mother, both being alive, take a joint estate for life in his lands, and his sister, being of full blood, took the remainder in fee, which at her death descended to her heirs. If, on the other hand, he was illegitimate, then, under the Act of 1855, his mother took the whole in fee simple.

The learned judge must have thought, as the counsel for the defendants in error argue, that after the Act of 1853 the children ceased to be illegitimate only as "*between their father and themselves.*" Notwithstanding the full and strong terms of that legislation, counsel will not agree that it legitimated the children any further than as concerned the one parent. To concede that it legitimated them as to both parents, would admit the mother to a joint inheritance. The immediate effect of such a qualified construction of the act must be to leave them illegitimate as to the mother, and then the Act of 1855 brings her in. The only answer which counsel make to the Act of 1855 is that George W. Killam was not, at its passage, of the class to which it applied. He had been created, say they, the legitimate son of his father by legislative enactment. He had been taken out of the inferior class of illegitimate "and clothed with all the civil rights of the superior class of legitimate children."

The argument is manifestly *felo de se.* You kill your first

[Killam v. Killam.]

position of a qualified or half legitimation, by your second, which invests the children with *all* the civil rights of legitimacy. The question here is not one of inheritance, but of transmission. George W. might have controlled the direction his estate should take by a will, but he elected to leave it to the transmission of the intestate laws. He must be presumed to have known what they were.

It is a truism, too simple to need more than mere assertion, that for the purposes of the intestate acts he must have been either legitimate or illegitimate. They provide for no mongrels or hybrids. Then let it be said that he was legitimate, that though not born in lawful wedlock, the transcendent power of the legislature had made him equal to a son born in lawful wedlock, that though his mother was not ascertained or mentioned by the legislature, she is fully indentified by the parties litigant, and her maternity admitted in the record before us, and therefore, that in legal judgment, she should be recognised as entitled to a joint life estate with the defendant in error in the decedent's lands. What is the objection to this? It may be said it is giving undue effect to the Act of 1853—that it is virtually making wedlock betwixt a man and a woman who is married to another man—that if the bastards had had several mothers, it would be marrying Killam to each of them, and that it establishes inheritable blood betwixt a brother and sister as well as between a father and his children. Let all these consequences be accepted, and what do they amount to? Notwithstanding Mrs. Tyler's present wedlock, she might have been Killam's lawful wife when these children were born. The legislature were not necessarily guilty of an historical untruth, or even of an anachronism, in enacting that she was. A divorce would have qualified her for the second marriage. How do we know that these children were not born in lawful wedlock, the legislature having said they were? How can we impeach the union between the parents, whatever it was, since the legislature has made it lawful? And why should not the act be construed to make George and Emily brother and sister? It is judicially ascertained that they were children of the same father and mother, and they have been legislatively declared legitimate. Then they were in law, as in fact, brother and sister of the full blood. As to the embarrassment which would be upon us if they had happened to have been born of different mothers, sufficient unto the day is the evil thereof. That question is not before us, and it shall not distress us.

The other construction of the Act of 1853, that which qualifies the legitimacy granted, is not free from greater difficulties. It is opposed to the terms of the enactment, which is sufficient to set it aside. We have seen that the words used by the legislature were large enough to confer all the civil rights of legitimacy, and

[Killam *v.* Killam.]

as it was a remedial and a humane law it ought not to be cramped in the construction. But again, the intestate laws cannot be administered on the theory of a partial legitimacy. This is apparent enough from what has been already said. It is to be observed that when they admit the mother to the inheritance of a deceased child, whether a legitimate or illegitimate, they admit her not as the wife of the father, but as *mother.* It is of no moment, therefore, that Mrs. Tyler is not Killam's wife, since he confesses her to be the mother of his children. In that maternal character she takes under the intestate law. If the Act of 1853 was intended for the very special purpose supposed by counsel, of establishing relations between the father and son in respect to the land in question, how do they account for Emily being embraced in it, between whom and her father there were no transactions in land?

· In view of the difficulties of both constructions, we think it more congenial to the spirit of our intestate laws, and more honourable to the motives of all parties, to impute to the Act of 1853, not the narrow and inconsistent purpose contended for, but the more generous intent of eradicating all manner of taint from the blood of both George and Emily, and compelling the world to treat them, for all purposes, as legitimate. The consequence is, that George could transmit and Emily could inherit under the intestate laws as if no defect had ever existed.

We see nothing to change our judgment in the fact that this land was conveyed to George W. by his father, for a consideration of natural love and affection. He held it as a purchaser, and at his death the fee simple descended to his sister, subject to a life estate of his father and mother for their joint lives and the life of the survivor. By the mother's conveyance to Jeptha Killam he took what she held and no more, and, therefore, the judgment should have been for the plaintiff below, not for the whole, but for a joint undivided moiety of the premises.

> The judgment is reversed, and judgment is now entered here in favour of George Killam, the plaintiff below and defendant in error, for an undivided moiety of the land mentioned in the writ.

STRONG, J., dissented.